# STATE OF VERMONT

# ENVIRONMENTAL COURT

Appeal of John Remy         }
}
}     Docket No. 93-6-03 Vtec
}
}

Decision and Order

Appellant John Remy appealed from a decision of the Development Review Board (DRB) of the Town of Williston denying his application for preliminary phasing allocation.

Appellant is represented by Carl H. Lisman, Esq.; the Town of Williston is represented by Paul S. Gillies, Esq. The parties filed a stipulation of 30 numbered paragraphs of facts on October 28, 2003. In addition, an evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge. The parties were given the opportunity to submit written requests for findings and memoranda of law. Upon consideration of the evidence and the written memoranda and proposed findings, the Court finds and concludes as follows.

Appellant owns a 7.7-acre parcel of land on the north side of Route 2 in the Village Center zoning district. The property is relatively flat, sloping gently to the north, and is relatively open, except for an existing house and barn, and a wooded buffer around the side and rear lot lines. Immediately to the west of Appellant's property along Route 2 is the Williston Bed and Breakfast; immediately to the east of Appellant's property along Route 2 is the former Lantman dwelling. The Town's elementary and middle school and Town library adjoin Appellant's property to the west. The school's athletic and play fields are located to the west and north (rear) of Appellant's property. Town property containing recreational or so-called " multi-use" paths is located to the north of Appellant's property. Additional Town property is located to the east of Appellant's property, behind the former Lantman dwelling. Immediately to the east is a small residential subdivision.

Appellant's property is located almost directly across Route 2 from the Town's municipal buildings, including the fire and police departments, the town manager, town clerk, and planning and zoning offices. Appellant's house and barn are located on the parcel, near its Route 2 frontage. Appellant operates an antiques business on the property. Within walking distance of the property are shops, churches, the town library, elementary and middle school, and other amenities. An existing concrete sidewalk runs along the north side of Route 2 at the property location.

Appellant proposes to subdivide the parcel into nine residential lots. This proposal requires subdivision approval but does not require approval as a planned residential development or a planned unit development, and Appellant has not proposed the project as a planned residential development or a planned unit development. Appellant proposes to develop the project in phases, with two units in the first year, four units in the second year, and two units in the third year.

Lot 1, fronting on Route 2, is proposed to be 36,000 square feet in area and to contain Appellant's house and barn. Its existing driveway with access onto Route 2 is proposed to be eliminated, so that Lot 1 and the eight new lots will all have access by a new public street to be constructed by Appellant, ending in a cul-de-sac. Appellant proposes to reserve a 64-foot-wide strip between Lot 5 and Lot 6, that could provide future public road connection to the east. A five-foot-wide sidewalk is proposed to run from the Route 2 sidewalk along the public road and around the cul-de-sac,

with two spur paths: one connecting to the recreational paths to the north, between Lot 6 and Lot 7, and one connecting to the school property to the west, along the southerly end of Lot 9.

Lots 2, 3, 4 and 5 are each slightly larger than the 20,000-square-foot minimum lot size. Lots 6, 7, and 8, at the end of the cul-de-sac, are somewhat larger in area, from 23,320 to 29,780 square feet. Lot 9 contains a similar-sized building envelope to Lots 2 through 5, but is 74,820 square feet in area, most of which is restricted to non-building uses due to wetlands. However, the restricted area that is part of Lot 9 is not preserved by easement or as an open-space lot. Each of the proposed building sites satisfies the setback, density, lot coverage, building coverage and building height requirements of the regulations.

Permitted uses in the Village Center zoning district include single-family and two-family residences and home occupations. The purpose of the district is " to create a compact, well-planned village center composed of single and two family dwellings together with neighborhood retail and service businesses, schools, and government and religious buildings."

The Town of Williston has adopted a process of Growth Management Review for proposed residential projects, to ensure that the rate of residential growth is consistent with the Comprehensive Plan and the Town's capacity to accommodate such growth. Article V of the Subdivision Regulations. Under that process, each proposed residential subdivision that has received concept plan approval may be considered for phasing allocation in the following calendar year. All eligible subdivisions are evaluated according to the standards found in ' 550; in the present case, Appellant appeals the rating given to his project under this section and the consequent denial of phasing allocation.

Constitutionality and Purpose of Section 550

Appellant argues that the point rating system in ' 550 is unconstitutionally void for vagueness. As applied to this application, it is not. It could be revised to be more complete or more specific, but it meets the test of providing sufficiently objective evaluation standards for the decisionmaker to provide a score for each of the competing applications to enable those application to be placed in a ranking or priority order. That is all that is at issue in this case.

When a scoring system is provided that divides a category into thirds, it is rational and reasonable to allocate the points available in that category evenly, so that each third contains a possible 6b points. Such an approach applied to a category worth a total of twenty points would make 6b the dividing point between the low and medium categories and 13" the dividing point between the medium and the high categories. Within each category, it is equally rational and reasonable to determine whether the project should rank higher or lower within that category by determining if it exhibits more or fewer of the features tested by that particular criterion. This is the approach applied by the Court in this de novo proceeding. Further, the Subdivision Regulations have been amended twice since the adoption of the 2000 Comprehensive Plan in January of 2001 and must be interpreted in light of the purpose of those regulations as carrying out that plan.

Application of Section 550

Location

A fair reading of the Town of Williston's Comprehensive Plan shows that the Town has focused its growth control efforts on avoiding sprawl so as to accommodate concentrated mixed use development in certain areas and to preserve both its rural and open space uses and historic character in other areas. The Comprehensive Plan recognizes the difficult problem of " planning for the development of a large area [that surrounding the Taft Corners intersection at Route 2 and Route 2A] in a manner that creates many of the amenities associated with traditional downtowns

while also avoiding the more typical patterns of suburban commercial development." Plan, at p. 23. Towards that end, an important goal of the Town's growth management policies is to transform the development surrounding the Taft Corners intersection into a " true multi-function downtown area" with relatively high densities and a " compact mixture of office, retail, restaurant, service and residential uses." Plan, at p. 23. The promotion of residential uses in this area is " fundamentally important" (Plan, at p. 29) to the area's mixed use character. It is this area that is the Town's " growth center."

While the historic nature of the Village as a civic center is discussed in the plan, to be preserved through residential development and open space preservation that is 'sympathetic" with its historic character, the rate of that residential growth in the Village is intended by the Plan to be 'slow to moderate." Plan, at p. 31. While the Village is a " center" of more concentrated and pedestrian-centered development, it is not a > growth center;" that is, the Plan does not express a preference for channeling a large proportion of the Town's residential growth into the Village. The Plan encourages the location of homes " within walking distance of schools, churches and public facilities' as the " very essence of a village." Plan, at pp. 30 and 31.

Appellant's project is thus not in a " growth center" and does not fall into the " high" category of points expressing this preference. It is within the sewer system area and qualifies for a score in the " medium" category with respect to its location. Because it meets the " walking distance" locational preferences within the Village area, as well as being within the sewer system area, Appellant's project is allocated 12 of the possible 20 points for the criterion of " Location."

Open Space Planning

Within this criterion, the > high'score category comprises those projects that provide " park land, path/trail or other public amenity of Town-wide importance" and those projects that use a " high degree of clustering to protect a valuable or [a] conservation resource." The " medium'score category comprises those projects that are characterized by " modest clustering and careful siting of homes;" while the " low'score category comprises those projects that use a 'standard subdivision layout with open space only within individual lots."

Appellant's project provides two connecting paths to the Town's pedestrian system, but even if they will be used by some non-residents of that subdivision traveling to and from the recreational paths to Route 2, they cannot be characterized as of Town-wide importance. Nor does the project use a high degree of clustering. Only one of the proposed house sites, Lot 9, is located on its lot to protect a conservation [wetlands] resource. Leaving aside the semantic distinction of whether a single house can even be said to be " clustered," the undeveloped open space on Lot 9 is not reserved as a common area for the subdivision, nor is it subject to some sort of conservation easement. Rather, it remains as open space " only within [the] individual lot[]" as described in the " low'score category.

Appellant's project therefore qualifies for a score in the " low" category, but recognizing that some wetland area within the individual Lot 9 is to remain undeveloped and that two paths of only local importance are to be provided. Accordingly, Appellant's project is allocated 4 of a possible 20 points for the criterion of " Open Space Planning."

Housing Types

Within this criterion, the > high'score category comprises those projects that provide " housing in a " preferred" category such as affordable or elder housing." The " medium'score category comprises those projects that provide " a variety of housing types, either within the subdivision or in combination with other nearby housing, to serve various population groups;" while the " low'score category comprises those projects that provide " a uniform housing type that continues

predominant housing patterns in the vicinity." This section does not use the term " house type" but rather uses the term " housing type;" that is, it focuses on the type of housing adapted to serve various components of the population, rather than on its architectural style.

The Comprehensive Plan discusses the various housing types available and needed within the Town in terms of whether they are single-family or multi-family; rental or owner-occupied; detached or town home (for which the term condo is imprecisely used); or mobile home as compared with on-site constructed homes. The Plan is explicit throughout its section on housing regarding the housing types that are sought to be encouraged by this element of the scoring system. Plan, pp. 44-51, passim. The specifically " preferred" housing categories are affordable housing (both owner-occupied and rental), elder housing, and housing located within the Taft Corners growth center. Plan, at p. 45. The predominant housing pattern is that of single-family, owner-occupied homes. Plan, at p. 47. By contrast, there is limited availability of rental housing, housing for low-to-moderate as well as low-income households, and so-called " starter" homes (modest-sized houses on modest-sized lots). Plan, at pp. 48 and 51.

Appellant's project proposes only single-family house sites on modest-sized lots. It does not provide affordable housing or elder housing or rental housing or multi-family housing. There is no restriction on the potential size of any house, within its allowed housing envelope, but the houses are expected to be relatively modest in proportion to the modest size of the lots. Accordingly, Appellant's project qualifies for a score in the " low" category, but above the lowest score in recognition that it may provide " starter" homes on small lots. It is allocated 4 of a possible 20 points for the criterion of " Housing Types."

Town Facilities

Within this criterion, the > high'score category comprises those projects that have minimal impact on schools or other Town facilities; the " medium'score category comprises those projects that A will be part of a controlled rate of growth that does not exceed the Town's capacity for planned, orderly and sensible expansion of its facilities;" and the " low'score category comprises those projects that A will place a high demand on Town services and may cause a need for expansion of school or other Town facilities earlier than projected in the Comprehensive Plan.

Appellant's project does not fall within the " high" category as it will present some additional demand on the schools and other municipal services. Nor does it fall into the " low" category, as it will not seriously burden municipal services or require earlier expansion of those services. Rather, it falls within the " medium" category.

Appellant's project would add eight households to the Village Center zoning district, which is calculated to add four elementary to middle-school age children to the school. (It was not clear to the Court whether this calculation already discounted those children who already were attending school within the town and would merely be moving within the Town's system; we did not deduct any further from the calculation.) The property is served by the municipal sewer system and the project will not require the earlier expansion of that system. Its location across the street from the Town's fire and police services and within walking distance of the school will reduce any travel-related demand or seasonal travel problems associated with back road or longer-distance travel of school buses, fire trucks or police cars.

Considering all these factors, the demand of this project for municipal services is well within the controlled rate of growth planned by the Town as reflected in the Comprehensive Plan. Accordingly, Appellant's project is allocated 10 of a possible 20 points for the criterion of " Town Facilities."

Length of Time Seeking Approval

Within this criterion, the > high'score category comprises projects seeking approval for more than five years, the " medium'score category comprises projects seeking approval for from one to five years, and the " low'score category comprises projects that are for the " first time subject to growth management review." We note that the text of the criterion makes a distinction between " seeking approval" in general and " subject to growth management review" (that is, Article V of the Subdivision Regulations) in particular.

Within the " medium" category, it would be rational for the points to increase as a project progressed from one to five years awaiting approval; similarly, within the " high" category it would be rational for the points to increase with the length of time a project has been awaiting approval. Within the low category, which only includes projects that are for the first time subject to growth management review, it makes sense for points to increase within that category for projects which have been seeking other earlier stages in the approval process in earlier years. Appellant made two prior proposals for this property that were tabled at the concept plan approval stage, and which he did not pursue further to a DRB ruling on concept plan approval. This project therefore qualifies for a " low'score, only slightly higher than the zero that would be allocated to an entirely new project that had never previously applied for any types of approvals.

Accordingly, Appellant's project is allocated 1 of a possible 10 points for the criterion of " Length of Time Seeking Approval."

Other Comprehensive Plan Goals

Within this criterion, the > high' ratings go to subdivisions that meet some other goal (or goals) of the Comprehensive Plan. This project meets other goals of the Comprehensive Plan for the Village Center area, not already considered in the point allocations in the other categories. This project meets the goal of the Plan for filling in 'small pockets' of available land along Route 2 for residential use within the Village Center district, and for keeping the Village compact by creating residences within walking distance of municipal facilities and small-scale commercial services. Plan, at p. 30-31 and p. 56. It meets the goal of the Plan for providing sidewalks and bike paths to connect the residential areas to each other and to attractions in the Village (Plan, at p. 30), and to contribute to more pedestrian-oriented neighborhoods and a sense of connection within the community. Plan, at p. 56. In addition, because the house designs will be subject to Historic District review, the houses will be sympathetic with the historic character of the Village. Plan, at p. 31.

Accordingly, Appellant's project is allocated 6 of a possible 10 points for the criterion of " Other Comprehensive Plan Goals."

Based on the foregoing, it is hereby ORDERED and ADJUDGED that Appellant's project qualifies for a total of 37 points out of a possible 100 points, under the standards of ' 550 of the Subdivision Regulations. This matter is hereby concluded in this Court and remanded to the DRB for it to conduct the review and ranking of the subdivisions and proceed with the remainder of the preliminary phasing allocations to the project in accordance with the regulations, using the point assessment for Appellant's project determined in this appeal.

Dated at Barre, Vermont, this 12th day of April, 2004.

_____
Merideth Wright
Environmental Judge